IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
WILLIAM   R.   SMITH,   as  )
administrator of the estate )
of Michael J. Smith,        )
                            )
     Plaintiff,             )
                            )      CIVIL ACTION NO.
     v.                     )       2:21cv468-MHT
                            )          (WO)
JEFFERSON DUNN, et al.,     )
                            )
     Defendants.            )
```

OPINION AND ORDER

Michael J. Smith was an inmate in the custody of the Alabama Department of Corrections (ADOC). He died after allegedly being beaten by two corrections officers at Ventress Correctional Facility. Plaintiff William R. Smith, the administrator of decedent Smith's estate, seeks to hold several prison officials liable in their individual capacities for decedent's death, including: Jefferson S. Dunn, then the Commissioner of ADOC; Charles Daniels, then the Associate Commissioner for Operations of ADOC; Matthew Brand, then the Associate Commissioner of Administrative Services of

ADOC; and Christopher Gordy, an ADOC correctional warden.[1] Plaintiff administrator asserts various Eighth Amendment violations, as well as a state-law wrongful-death claim. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental).

Now pending before the court are two motions to dismiss: one filed by Gordy, and another filed by Dunn, Daniels, and Brand. These defendants move to dismiss the claims against them for failure to intervene (Count 2), failure to protect from specific risk of harm (Count 4), failure to protect from generalized risk of harm (Count 5), state-created danger (Count 6), and wrongful death (Count 7).

---

1. Plaintiff administrator also names JuJuan Whigham, Derek T. Simmons, Dennis Brown, and Dominic Whitley as defendants. These individuals are corrections officers of various ranks who were employed at the Ventress facility and allegedly either beat Smith to death or witnessed the deadly assault without intervening. Each of these defendants has answered plaintiff's amended complaint. None has moved to dismiss it.

2

Defendants challenge the sufficiency of plaintiff administrator's allegations, contend that qualified immunity bars plaintiff's claims, that the wrongful-death claim fails, and that the amended complaint should be dismissed as an impermissible shotgun pleading. Gordy separately argues that Eleventh Amendment sovereign immunity applies. For the reasons set forth below, defendants' motions are due to be granted in part and denied in part.

## I. MOTION-TO-DISMISS STANDARD

Defendants bring motions to dismiss under subpart (b)(1) of Rule 12 of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, and under subpart (b)(6) of the same rule for failure to state a claim upon which relief can be granted. In considering a motion to dismiss, the court accepts the plaintiff's factual allegations as true, *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes

3

the complaint in plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).  The court may draw "reasonable inferences" from the facts alleged in the complaint.  *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).


## II.  BACKGROUND

The facts alleged in the amended complaint, taken in the light most favorable to plaintiff administrator, are as follows.

In 2016, the United States Department of Justice (DOJ) opened an investigation into suspected Eighth Amendment violations at ADOC's male correctional facilities, including Ventress Correctional Facility. After a three-year investigation, DOJ issued two reports on the conditions in the male prisons: one in

April 2019, and a second in July 2020.[2]  The 2020 Report

focused on excessive use of force by ADOC officials.

--------

2. The 2019 report is available at U.S. DOJ, *Investigation of Alabama's State Prisons for Men* (April 2, 2019), https://perma.cc/6TRX-B5SJ, and the 2020 report at U.S. DOJ, *Investigation of Alabama's State Prisons for Men* (July 23, 2020), https://perma.cc/VP7B-29L5.  Because plaintiff administrator incorporated the 2020 report by reference, the court will consider it in deciding this motion.  *See Turner v. Dunn*, No. 2:22cv624-MHT, 2025 WL 1869428, at *1 (M.D. Ala. July 7, 2025) (Thompson, J.) (relying on DOJ's 2019 and 2020 reports in resolving dismissal motion).  In general, if a district court "considers materials outside of the complaint, [it] must convert the motion to dismiss into a summary judgment motion."  *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).  But, under the exception for documents incorporated by reference, a court may consider an extrinsic document without converting a motion to dismiss into a motion for summary judgment, "if [the document] is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  *Id.*

Here, the 2020 report is central to plaintiff's claims.  Paragraphs 48 through 90 of the amended complaint summarize the report, often directly quoting it in the process.  *Compare* Pl.'s Am. Compl. (Doc. 44) ¶ 51, *and id.* ¶ 62, *with* 2020 Report, at 6, *and id.* at 11.  Plaintiff explains that the report provides

The amended complaint summarizes the 2020 DOJ report and alleges that ADOC's male correctional facilities suffered from severe overcrowding and understaffing, which worked in tandem with inadequate supervision to "foster[] a culture where unlawful uses of force [were] common." 2020 Report (Doc. 44-4) 3. The 2020 report alleges that overcrowding tends to increase tensions among inmates, while understaffing can make corrections officers feel outnumbered and therefore make them more likely to respond to any disturbances with a show of force.  It further noted

---

evidence of the rampant use of unlawful force at Ventress and throughout ADOC.

Moreover, while defendants challenge the accuracy of the report, they do not challenge the report's authenticity.  In fact, three defendants cite the July 2020 report in their joint brief.  *See* Dunn, Daniels, and Brand Br. (Doc. 97) 18.

Finally, there is the court's ability to take judicial notice of the existence of the reports.  The court does not consider the 2019 report because plaintiff does not reference it.

that the prevalence of weapons, contraband, and malfunctioning locks throughout ADOC facilities only exacerbate officers' feelings of insecurity. Altogether, it represented that overcrowding, understaffing, and dangerous conditions increase both the frequency and intensity of uses of force in ADOC. Finally, it posits that minimal sanctions for violent conduct create a culture of impunity that leads officers to believe they can get away with using unlawful force. The DOJ report alleged that uses of force were "so commonplace" that officers and supervisors would watch beatings occur without intervening, and that "some officers appear[ed] accustomed to that level of violence and consider[ed] it normal." 2020 Report (Doc. 44-4) 24. The report further alleged that the available data likely underestimated the extent of unlawful force in ADOC facilities, as (1) many instances are underreported or

7

unreported; and (2) for instances that were reported, ADOC's investigative unit deemed many of them unsubstantiated even though the investigative files lacked critical information.

One of the prisons DOJ investigated was Ventress Correctional Facility, where decedent Smith was incarcerated, and defendant Gordy was a warden. Ventress houses medium-security prisoners. Most inmates at the facility live in open, barracks-style dormitories.

In 2017, just two years before Smith's death, ADOC documented 1,800 uses of force across all facilities. At Ventress specifically, plaintiff administrator identified at least 20 violent episodes in the three years leading up to Smith's death.[3] At least four of

---

3. There is some dispute about how many assaults plaintiff administrator alleges took place at Ventress. Dunn, Daniels, and Brand place the number at ten over two years. Gordy's count sits at nine over ten years.

those instances--one in January 2017, and three in the six months leading up to Smith's death (May 2019, July 2019, and September 2019)--involved injuries so severe the victims had to be hospitalized.

The DOJ report alleges that Ventress's own standard operating procedure governing use of force was inadequate. While ADOC's general regulations require that force be used only after attempting de-escalation, Ventress's written procedures contained no such requirement. Indeed, officers at Ventress used force on compliant or restrained inmates at least four times in the two years prior to Smith's death. Smith's death itself features in the 2020 report as an emblematic instance of excessive force.

---

However, by the court's calculation, the amended complaint and exhibits allege a total of 20 different incidents over three years, or 16 if the focus is on only 2018 and 2019. *See* Am. Compl. (Doc. 44) ¶¶ 59, 60, 62, 68, 74-88; 2020 Report (Doc. 44-4) 10.

Smith was assaulted on November 30, 2019. After intervening in an argument between Smith and another inmate, three officers took Smith to a hallway where they began beating him. One officer struck Smith with his hand. Another beat Smith with a chair. The two officers continued to beat Smith until he was unconscious and visibly bleeding, while the third officer watched. A fourth officer came across the scene, saw what was happening, and did nothing to intervene. At some point, the officers moved an unconscious Smith into a supply closet where they continued to beat him. Eventually, the officers called in some other inmates to take Smith to the Ventress infirmary.

In the early morning hours of December 1, 2019, Smith was taken from the Ventress infirmary to a free-world hospital. From there, he was quickly referred to another hospital because of the extent of his injuries.

He remained in the hospital until his death on December 4, 2019.  The autopsy ruled Smith's death a homicide.

### III. DISCUSSION

#### A. Plaintiff's Eighth Amendment Claims

Plaintiff administrator alleges that defendants Dunn, Daniels, Brand, and Gordy violated decedent Smith's Eighth and Fourteenth Amendment rights, as enforced through 42 U.S.C. § 1983, in various ways.  In Count 2, plaintiff asserts that Dunn, Daniels, Brand, and Gordy failed to intervene in the assault on Smith.  In Count 4, plaintiff asserts that defendants are liable for failing to protect decedent Smith from a specific risk of harm.  In Count 5, plaintiff asserts the same under a generalized-risk theory involving supervisory liability.  And in Count 6, plaintiff alleges defendants contributed to state-created danger.

Plaintiff concedes in his responses to the motions to dismiss that the failure-to-intervene claim in Count 2 and the state-created danger claim in Count 6 should be dismissed. That leaves the court with the specific-risk theory in Count 4 and the generalized-risk theory in Count 5. Defendants challenge the sufficiency these claims and argue that qualified immunity bars them. Gordy also asserts sovereign immunity.

1. Defendants' Qualified-Immunity Defense

Defendants attempt to invoke qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Determining whether qualified immunity applies involves two distinct inquiries, which a court may resolve in either order: whether the plaintiff's allegations "make out a violation of a constitutional right," and whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).[4] Because, as explained below, the allegations in plaintiff administrator's amended complaint would, if proven, amount to a violation of the Eighth Amendment under a generalized-risk theory, and because the right to be free from excessive violence was clearly established at the time of Smith's beating and death, the court will deny the motions to dismiss as to the Count 5

---

4. Because there is no dispute over whether the defendants were acting in their discretionary authority, the court does not address that threshold requirement for qualified immunity.

generalized-risk claim.  The court will dismiss Count 4, however, because plaintiff has not pleaded enough facts to support a constitutional violation under a specific-risk theory.

### i. Constitutional Violations

The Eighth Amendment to the United States Constitution guarantees the right not to be "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  This includes the right to be free from excessive force by corrections officers. *See id.* at 832.  Under *Farmer* and its progeny, plaintiff administrator must make out three elements to prevail on his Eighth Amendment claims against defendants: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579,

14

1582 (11th Cir. 1995). Count 5 pleads a
failure-to-protect claim under this standard that is
premised on defendants' deliberate indifference, as
supervisors, to a generalized risk of harm at Ventress.
Count 4 is a straightforward failure-to-protect claim
that alleges defendants were personally deliberately
indifferent to a specific risk of harm to decedent
Smith. The court will first discuss Count 5 before
turning to Count 4.

*Count 5: Generalized-Risk*: Because Count 5's
generalized-risk claim relies on supervisory liability,
it becomes more complicated. 42 U.S.C. § 1983, which
is the basis for plaintiff administrator's claim, does
not make supervisors automatically liable for their
subordinates' actions. *See Cottone v. Jenne*, 326 F.3d
1352, 1360 (11th Cir. 2003); *abrogated in part on other
grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir.
2010). "Instead, supervisory liability under § 1983

occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.*[5]

A plaintiff may establish supervisory liability for a § 1983 Eighth Amendment failure-to-protect claim in various ways.

First, a plaintiff may show that "the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360

---

5. Defendants attempt to argue that the 'personal involvement' requirement for supervisory liability means that defendants must have been "present at the scene." Dunn, Daniels, and Brand Br. (Doc. 98) 9–10. However, a supervisor is 'personally involved' as long as any of his "acts and omissions"--which includes supervising staff and overseeing operations--"resulted in the constitutional deprivation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir.1995).

16

(citations and quotation marks omitted).    Here,
plaintiff administrator has not made such allegations.

Second, a plaintiff may prove a "history of
widespread abuse put[] the responsible supervisor on
notice of the need to correct" the asserted
constitutional violation, but the supervisor failed to
do so.  *Id.* (citation and quotation marks omitted).  To
establish liability for a history-of-widespread-abuse
claim (also known as a generalized-risk or dangerous
conditions claim), a plaintiff must allege conditions
that "present an objectively substantial risk of
serious harm." *Marsh v. Butler Cnty.*, 268 F.3d 1014,
1029 (11th Cir. 2001) (en banc), *abrogated in part on
other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 561–63 (2007).  For claims like this one based on
guard mistreatment, a plaintiff must "show that inmate
abuse at the hands of guards was not an isolated
occurrence, but rather [that it] occurred with

17

sufficient regularity" to provide notice to supervisors. *Matthews v. Crosby*, 480 F.3d 1265, 1275 (11th Cir. 2007). Next, the plaintiff must show that an official was deliberately indifferent despite knowledge of the abusive history. *See id.* Then, the plaintiff must explain how that official's deliberate indifference caused the injury at issue. *See id.* As explained in more detail later, plaintiff has adequately pled a claim under this theory.

Third, a plaintiff may show "a supervisor's custom or policy results in deliberate indifference to constitutional rights." *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006). In the amended complaint and his briefs in opposition to the motions to dismiss, plaintiff asserts that defendants' customs or policies were deliberately indifferent to decedent's constitutional rights. But because plaintiff has already adequately pled a generalized-risk claim, the

court need not decide whether his assertions would also
establish a custom or policy claim.

Plaintiff sufficiently alleged that defendants are
liable based on history of abuse at Ventress. Prison
conditions that give rise to an excessive risk of
violence create a substantial risk of harm. *See
Purcell ex rel. Morgan v. Toombs Cnty.*, 400 F.3d 1313,
1320 (11th Cir. 2005). Plaintiff alleges that there
was a continuous history of abuse at Ventress, and that
the combination of overcrowding, understaffing, and
lack of meaningful oversight at the facility created a
substantial risk of serious harm. In 2019,
Ventress--like other ADOC facilities--was holding more
people than it was designed to house and was
understaffed by as much as 50% or more. The
understaffing issue extended to the supervisory level.
The DOJ report notes that contraband flowed in an out
of the prison, and violence abounded with impunity.

19

Guard-on-inmate assaults occurred regularly. In 2017 alone ADOC reported 1,800 instances of guards using force against inmates, many of which the DOJ deemed unjustified. Ventress proved particularly violent. Plaintiff alleged 20 instances of unlawful force over a three-year period, including three separate instances in the six months before Smith's death that were severe enough to require hospitalization.

Defendants argue that this evidence falls short of "extreme conditions" that would pose a substantial risk of harm. Dunn, Daniels, and Brand Br. (Doc. 97) 12. They protest that the 2020 report upon which plaintiff relies "contains numerous inaccuracies." *Id.* But arguments about the report's veracity are premature; at the motion-to-dismiss stage, the court accepts the plaintiff's allegations as true. Together, the allegations in the report and the amended complaint

sufficiently demonstrate that violent conditions at
Ventress were "obvious, flagrant, rampant[,]" and
continuous. *Brown v. Crawford*, 906 F.2d 667, 671 (11th
Cir. 1990). Defendants' main grievance is that
plaintiff has not alleged enough instances of violence,
but that is plainly contradicted by the pleadings.
Plaintiff has alleged thousands of forceful episodes
across ADOC and specifically describes 20 that occurred
at Ventress in the years preceding Smith's death. Even
more concerningly, plaintiff's allegations show that
the violence at Ventress was escalating; during the six
months before Smith died three other Ventress inmates
were beaten so badly they had to be taken to a
hospital. To sum up in the words of the report and
plaintiff's amended complaint: "uses of force are so
commonplace in Alabama's prisons that officers, even
supervisors, watch other officers brutally beating

prisoners and do not intervene." Am. Compl. (Doc. 44) ¶ 70.

In addition to abuse by guards, the DOJ report notes that ADOC suffered from understaffing, overcrowding, and difficulty keeping contraband weapons under control. These conditions contributed to the culture of violence at ADOC. The Eleventh Circuit has repeatedly held that the combination of overcrowding, understaffing, inadequate supervision, the presence of contraband, and regular incidents of violence in a correctional setting can create a substantial risk of serious harm. *See Hale*, 50 F.3d at 1583-84; *Marsh*, 268 F.3d at 1029; *Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291, 1309-10 (5th Cir. 1974).[6] At least at this stage of the

---

6. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of

litigation, the amended complaint makes out a plausible claim that "violence was the norm or something close to it" at Ventress. *Purcell*, 400 F.3d at 1322.

In addition to demonstrating that the history of abuse objectively posed a risk of serious harm, plaintiff administrator must show that each defendant acted with deliberate indifference to that risk. Deliberate indifference has three elements: (1) the official was subjectively aware of the risk but (2) disregarded that risk by (3) engaging in conduct that amounts to "subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1258 (11th Cir. 2024) (en banc) (quoting *Farmer*, 511 U.S. at 839). To establish subjective recklessness, a plaintiff must show "that the defendant actually knew that his conduct--his own acts or omissions--put the

---

the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

inmate at substantial risk of serious harm." *Id.* at 1253 (cleaned up). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted).

The court must determine whether the facts in the amended complaint plausibly allege that the defendants actually knew that their conduct, through acts or omissions, put decedent Smith at a substantial risk of serious harm, and they nevertheless disregarded that risk.

Plaintiff has plausibly alleged enough facts that, if proven true, create a reasonable inference that defendants knew about the wide-spread dangerous

violence at Ventress and refused to act. The allegations in the amended complaint suggest that the conditions at Ventress were in such a dire state that these defendants "knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. The amended complaint posits that defendants knew of the rampant violence by virtue of their roles and responsibilities. Dunn and Daniels were responsible for daily operations of ADOC and its facilities, including ensuring safety at the facilities. Brand was responsible for staff development, training, and education. And Gordy, as warden of Ventress, would have overseen the daily operations of Ventress itself. Plaintiff also alleges that Gordy witnessed violence at Ventress and other facilities as he rotated through various warden positions across the ADOC system.

Defendants argue that this evidence does not provide sufficient notice and rely on *Matthews v. Crosby*, 480 F.3d 1265 (11th Cir. 2007), to support their position. In that case, the plaintiff proved the subjective knowledge element by providing evidence that a warden had been warned by his predecessor about certain violent guards and corrupt office workers. *See id.* at 1271. Defendants contend that plaintiff's allegations fall short of this standard, and that the DOJ report could not have provided notice of the conditions at Ventress because it was sent to defendants after Smith's death.

These arguments fail for a couple of reasons. For one, *Matthews* is distinguishable: it was concerned, in part, with whether the warden knew of the specific risk posed by a particular corrections officer, not just whether there was a history of abuse at the facility. *See id.* As such, the court there relied on details

26

like the previous warden's warning to show that a
particular officer posed a threat. *See id.* As
previously discussed, plaintiff here was unable to show
that defendants had subjective knowledge of a specific
risk. However, plaintiff has demonstrated the general
history of abuse was so obvious that it was known.
Second, receiving a copy of the DOJ report is not the
only way that defendants would have learned about its
contents. As ADOC officials, they would have had
access to the same reports that DOJ reviewed. The
Eleventh Circuit has credited allegations that jail
officials up to the highest levels would have
"knowledge through force reports and similar documents"
of what goes on at their facilities. *See Danley v.
Allen*, 540 F.3d 1298, 1315 (11th Cir. 2008) *overruled
in part on other grounds as recognized by Randall v.
Scott*, 610 F.3d 701, 709 (11th Cir. 2010) (internal
quotations omitted). Moreover, district courts

27

throughout Alabama have examined similar claims against these same officials and concluded that "it is plausible that [ADOC officials] were aware of the understaffing, overcrowding, violence statistics, ... et cetera, at Ventress." *Barefield v. Dunn*, 688 F.Supp.3d 1026, 1081 (2023) (Watkins, J.) (assuming Dunn, Daniels, and Brand had knowledge of the DOJ report contents even *before* they were formally notified) (collecting cases). Indeed, concluding otherwise "would require the court to erroneously ignore, pre-evidence, logical inferences that plausibly confer subjective awareness." *Id.* The same logic applies to Gordy, who, as warden of Ventress, would have been even more familiar with conditions there, *see id.* at 1078, and whom plaintiff alleges witnessed the violence at Ventress firsthand. *See also Danley*, 540 F.3d at 1315 (crediting plaintiff's allegations that a

jail administrator would have seen the alleged violence at the facility).

Plaintiff represents that, despite their knowledge of dangerous conditions at Ventress, and despite having the discretion and means to remedy the issue, defendants "failed to take any corrective action" to mitigate guard-on-inmate violence, whether by conducting additional training, or taking more punitive actions against offending officers. *See* Am. Compl. (Doc. 44) ¶¶ 155–58, 97–100. Defendants also failed to address the other precipitating causes identified in the DOJ report, like overcrowding, understaffing, and contraband weapons. The amended complaint alleges that ADOC rarely suspended or dismissed correctional officers for using unwarranted force. This claim is supplemented by the DOJ report, which devotes several pages to describing how ADOC's review system lacked accountability and perpetuated a culture of impunity.

For example, ADOC's disciplinary review system did not have a centralized method for determining whether an officer had prior, substantiated excessive force allegations. This lack of tracking ensured that violent officers could cycle through different facilities without accruing a record of their misconduct. The amended complaint's allegations that defendants failed to adequately supervise, discipline, and train Ventress corrections officers--while recognizing that understaffed guards continued to assault overcrowded inmates--plausibly pleads a deliberate-indifference claim. On the amended complaint's telling, defendants' response to the problems at Ventress was tantamount to complete inaction. Defendants allegedly did not even review Ventress's use-of-force policy to ensure it was consistent with other facilities or even ADOC's own central guidance. Courts have long deemed

deliberate-indifference claims viable when prison officials practically ignore obvious safety risks to inmates, as plaintiff alleges here. *See, e.g.*, *Hale*, 50 F.3d at 1584-85 (finding a triable issue of fact on whether a sheriff's "failure to take meaningful action" to address overcrowding, inadequate supervision by guards, and violence among jail inmates constituted deliberate indifference); *LaMarca v. Turner*, 995 F.2d 1526, 1537-38 (11th Cir. 1993) (identifying sufficient evidence to find prison administrators deliberately indifferent based on their failure to supervise staff and inmates).[7]

_____

    7. To rebut a deliberate-indifference claim, "[o]fficials might show: (1) 'that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger'; (2) 'that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent'; or (3) that 'they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611,

Finally, plaintiff has asserted a plausible claim that defendants' deliberate indifference caused Smith's injuries and death. The relevant inquiry to determine causation is whether a plaintiff can identify "conditions of confinement that were under [the defendants'] control and that together created an unconstitutional risk of violence." *LaMarca*, 995 F.2d at 1526. Plaintiff contends that Dunn, Daniels, and Brand were high-level officials in ADOC with the power to take corrective action to minimize abuses of force.

---

617–18 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844). The court must take the allegations in the complaint as true, and the amended complaint alleges that the ADOC administrators effectively did nothing over a three-year period despite knowing about a substantial danger of wide-spread violence at Ventress. Defendants argue that ADOC did take action, in the form of reviewing some complaints for excessive force, as documented in the DOJ report. However, a response must still be reasonable. ADOC continued to adhere to its flawed disciplinary review system and took no additional action despite evidence of mounting violence. That is arguably not a reasonable response based on the allegations in the amended complaint.

Gordy, as warden, had direct authority over the guards who, according to the amended complaint, perpetuated the violence or stood idly by, often without any repercussions. The amended complaint posits that defendants possessed the discretion to issue policies or develop further training to address the history of violence at Ventress. At the motion-to-dismiss stage, this is sufficient to plead causation.

Because plaintiff has plausibly alleged a substantial risk of harm, deliberate indifference, and causation as to the generalized-risk claim in Count 5, the court cannot accept the defendants' argument that he has failed to "make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (quoting *Saucier*, 533 U.S. at 201).

*Count 4: Specific-Risk Claim*: The court now turns to Count 4, which pleads a failure-to-protect claim based on a specific threat. Plaintiff alleges that

33

"[d]efendants knew [of] and disregarded the substantial risk that Mr. Smith would be seriously injured while in custody at Ventress." Plaintiff alleges that two officers--Officer Whigham and Officer Whitley--posed a specific threat of harm based on their past misconduct and reputations for violence. *See* Am. Compl. (Doc. 44) ¶ 151.

While plaintiff's amended complaint adequately pleads an objective, substantial threat, it fails on the deliberate indifference element because the facts are insufficient to infer that talk of Whitley and Whigham's misconduct ever reached defendants' ears. The amended complaint alleges (1) that Whigham and Whitley had reputations of beating inmates at Ventress; (2) that Whitley was investigated for excessive force at Bullock in 2008 and involved in another incident in 2016; and (3) that Whigham had beaten another inmate at Ventress at some point before Smith's death. Missing

34

from these allegations are details showing how any of these defendants knew about these incidents.

Since defendants would have access to different information based on their roles, the court will first address whether Dunn, Daniels and Brand (the ADOC upper-level officials) would have subjectively known about Officers Whigham and Whitley.  The court will then turn to whether Gordy (the warden of Ventress) would have known about the misconduct.

Plaintiff has not pleaded enough facts to infer that Dunn, Daniels, and Brand knew about Whigham and Whitley's misconduct.  Such high-ranking ADOC officials would be unlikely to know about the behavior of individual officers unless they were specifically notified.  The Commissioner is notified about individual officers when ADOC's central investigative unit makes a finding about a complaint for excessive force.  While that may initially indicate that Dunn

knew about Whitley, since Whitley was investigated for using excessive force in 2008, Whitley's investigation occurred several years before Dunn became commissioner. Simple logic dictates that timing of tenure matters for showing subjective knowledge of an event. *See Barefield*, 688 F. Supp. 3d. at 1077 (dismissing claims against a warden who had resigned six months before the plaintiff was assaulted). Aside from the 2008 grievance, plaintiff has not indicated whether any of the incidents involving Whitley or Whigham were reported on the institutional level, let alone the state-wide level. The court cannot assume, absent additional allegations, that Dunn, Daniels, or Brand subjectively knew about those individual incidents.

Whether plaintiff has alleged sufficient facts to demonstrate that Gordy had subjective knowledge is a closer call. Gordy, as warden of Ventress, was responsible for daily operations of the facility,

36

including overseeing staff. Additionally, as the DOJ
report alleges, wardens review complaints of excessive
force. Therefore, Gordy would have knowledge of
individual instances of force at Ventress and other
facilities he worked at. However, timing again is an
issue. Gordy became warden of Ventress in 2019. The
two formal grievances against Whitley occurred in 2008
and 2016, and thus pre-date Gordy's time as warden.
Meanwhile, plaintiff's other allegations about Whitley
and Whigham's behavior contain no information to
determine whether they occurred while Gordy was warden
and even whether they were reported. *See Cox v.
Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021) (holding
plaintiff had not adequately pleaded subjective
knowledge where the complaint mentioned a PREA report
had been filed but neglected to describe its contents).
Likewise, plaintiff's allegations about Whitley and
Whigham's reputations lack facts demonstrating that

37

their reputations were known to staff as well as
inmates.  In sum, there are not enough allegations to
show that Gordy was "aware of facts from which the
inference could be drawn that a substantial risk of
serious harm exist[ed]" and that Gordy "dr[ew] the
inference." *Farmer*, 511 U.S. at 837.  Accordingly, the
court grants defendants' motions to dismiss as to the
claim under a specific-risk theory in Count 4.


ii. Clearly Established Law

As to Count 5, there are three ways for a plaintiff
in the Eleventh Circuit to show that a right was
clearly established.  First, "the plaintiff can point
to a materially similar case decided at the time of the
relevant conduct by the Supreme Court, the Eleventh
Circuit, or the relevant state supreme court." *J W ex
rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d
1248, 1259 (11th Cir. 2018) (per curiam).  The case

38

"need not be directly on point," but it must "have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 89 (2017)). "Second, the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation." *J W*, 904 F.3d at 1259. Or, third, the plaintiff can demonstrate that the alleged conduct "so obviously violated the Constitution that prior case law is unnecessary." *Id.* at 1260.

Before the events at issue in this suit, "it was clearly established in [the Eleventh] Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions ... that pose a risk of serious physical harm to inmates," regardless of whether that risk of harm comes from corrections officers or other inmates. *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1034 (11th Cir. 2001) (en banc);

*see also Matthews v. Crosby*, 480 F.3d 1265, 1275 (11th Cir. 2007); *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583-84 (11th Cir. 1995); *Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977); *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993). The Eleventh Circuit has long held that supervisors who are "on notice of the need for improved training or supervision" of subordinates can be liable when they fail to take corrective action. *Fundiller v. City of Cooper*, 777 F.2d 1436, 1443 (11th Cir. 1985). Circuit precedent also dictates that prison officials are deliberately indifferent when they allow conditions at a facility to deteriorate to the point that serious violence becomes "the norm or something close to it." *Purcell ex rel. Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1322 (11th Cir. 2005). Finally, the Eleventh Circuit has permitted deliberate-indifference claims to proceed based on prison officials' failures to address persistent

overcrowding and understaffing. *See Marsh*, 268 F.3d at 1029.

In sum, by the time of Smith's beating and death, the Eleventh Circuit had clearly established that prison officials are liable for deliberate indifference to a substantial risk of serious harm when they ignore conditions that permit violence to become a fixture of life behind bars, including: deficient training, inadequate supervision, chronic understaffing, and overcrowding. Whether plaintiff can muster the evidence to prove these allegations is another matter entirely. But the precedent available at the time of Smith's beating and death provided ample notice that prison officials violate the Constitution by knowingly subjecting inmates to an excessive risk of violence and consciously disregarding that risk. The Eighth Amendment right that plaintiff now seeks to assert in his generalized-risk claim in Count 5 was clearly

41

established, and so defendants cannot invoke qualified immunity.

### 2. Gordy's Sovereign Immunity Defense

The court now turns to Gordy's assertion that he is entitled to sovereign immunity under the Eleventh Amendment and Alabama law.  In essence, he contends that the federal claims in the amended complaint are, in actuality, impermissible claims against the State of Alabama itself.

"[T]he Eleventh Amendment bars a damages action against a State in federal court," including "when State officials are sued for damages in their official capacity."  *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  However, Eleventh Amendment immunity does not extend to individual-capacity suits against state officials under § 1983, *see Hafer v. Melo*, 502 U.S. 21, 30–31 (1991); it only applies when the State is the

true party in interest, *see id.* The State is considered the true party in interest only if "the relief sought against the nominal defendant would in fact operate against the state, especially by imposing liability damages that must be paid out of the public [treasury]." *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994). In other words, "Eleventh Amendment immunity applies only if the judgment *must*, under all circumstances, be paid out of state funds." *Id.* (emphasis in original).

Warden Gordy does not represent that Alabama would be obligated to cover the costs of a judgment against him in his individual capacity. Because plaintiff seeks damages against him personally and not from the state coffers, the Eleventh Amendment presents no bar to relief.

Alabama state-law sovereign immunity also does not bar plaintiff's ability to obtain relief. "As an

43

Alabama state court has correctly recognized, such immunity does not apply to federal claims like the one asserted here." *Brown v. Dunn*, 760 F. Supp. 3d 1326, 1342 (M.D. Ala. 2024) (Thompson, J.) (citing *King v. Corr. Med. Servs., Inc.*, 919 So. 2d 1186, 1191 (Ala. Civ. App. 2005)).[8]

---

8. Gordy also contends that, because plaintiff can obtain damages otherwise barred by sovereign immunity by bringing his claim before the Alabama Board of Adjustment, sovereign immunity should bar him from recovering damages by suing officials in their individual capacity. Gordy is mistaken. For one, this argument just begs the question of whether Gordy is entitled to sovereign immunity in the first place, and, as already stated, he is not. *See Brown v. Dunn*, 760 F. Supp. 3d 1326, 1334 (M.D. Ala. 2024) (Thompson, J.); *Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1060 (M.D. Ala. 2023) (Watkins, J.). Moreover, the existence of an alternative state forum does not entitle Gordy to Eleventh Amendment immunity. *See Monroe v. Pape*, 365 U.S. 167, 183 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); *Brown*, 760 F. Supp. 3d at 1334.

### B. Plaintiff's Wrongful-Death Claim

The court now turns to Count 7, in which plaintiff administrator claims that defendants violated Alabama's wrongful-death statute.

Under the traditional common-law rule, an injured party's personal tort claims abate upon his death. *See Robertson v. Wegmann*, 436 U.S. 584, 589 (1978). In other words, there is no survivorship under the traditional common-law rule. *See id.* Unsatisfied with that harsh rule, Alabama passed a wrongful-death statute, which permits survivorship when a decedent's death is caused by "the wrongful act, omission, or negligence of any person, persons, or corporation," Ala. Code § 6-5-410(a). *See Simmons v. Pulmosan Safety Equip. Corp.*, 471 F. Supp. 999, 1001 (S.D. Ala. 1979) (Thomas, J.). Here, plaintiff contends that all defendants' Eighth Amendment violations were a wrongful act or omission that caused decedent's death. While

plaintiff asserts Count 7 separately from the other counts, Count 7 is redundant, for it just reasserts the claims in the previous counts.

To understand why Count 7 is redundant, it helps to provide some explanation about why plaintiff may assert the § 1983 Eighth Amendment claims in the preceding counts. The Eleventh Circuit has explained that, "[b]y its terms, 42 U.S.C. § 1983 does not provide for the survival of civil rights actions." *Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1045 (11th Cir. 2011). "Due to this 'deficiency' in the statute, the survivorship of civil rights actions is governed by 42 U.S.C. § 1988(a)." *Id.* Section 1988(a) "generally directs that, where federal law is 'deficient,' the state law of the forum applies," so long as that law is not inconsistent with federal law. *Id.* (quoting 42 U.S.C. § 1988(a)).

Generally, "the applicable Alabama survivorship law is Ala. Code § 6-5-462," which requires that a decedent's unfiled tort claims abate upon his death. *Id.* at 1046 (cleaned up).  If this survivorship statute were to apply, then decedent Smith's Eighth Amendment claim would not survive his death.  *See id.*

However, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala. Code § 6-5-410."  *Id.* at 1047 (cleaned up).  To permit otherwise would allow a state actor to "escape § 1983 liability by killing off the victim," thereby undermining the "deterrent purposes of the statute." *Id.* at 1048 n.10.

Here, as already discussed, defendants' constitutional violation allegedly proximately caused decedent's death; therefore, plaintiff may use Alabama's wrongful-death statute to resolve the

deficiency and resurrect decedent's § 1983 Eighth
Amendment claims. *See id.* at 1047–48, 1047 n.9. In
essence, he can claim that defendants' Eighth Amendment
violation (other Counts) also violates the
wrongful-death statute (Count 7), which contains a
survivorship provision incorporated through § 1988(a),
allowing plaintiff to assert decedent's § 1983 claim
(other Counts). As plaintiff's § 1983 claim is based
on a violation of the wrongful-death statute, Count 7
is just repeating the claim in Counts 4 (specific-risk
claim) and 5 (generalized-risk claim).[9] *See Brown v.
Dunn*, 760 F. Supp. 3d 1326, 1342 (M.D. Ala. 2024)
(Thompson, J.). Accordingly, Count 7 will be

---

9. Gordy also argues Count 7 is barred by
state-agent immunity, but as this section explains,
Count 7 just repeats the other Counts. And as an
Alabama state court has correctly recognized, such
immunity does not apply to federal claims like the ones
asserted here. *See King v. Corr. Med. Servs., Inc.*,
919 So. 2d 1186, 1191 (Ala. Civ. App. 2005); *see also
Brown*, 760 F. Supp. 3d at 1342 (state-agent immunity
does not apply to § 1983 federal claims).

48

dismissed, albeit without prejudice, as redundant. *See id.* (dismissing state-law wrongful-death claim as redundant to § 1983 failure-to-protect claim); *Turner v. Dunn*, No. 2:22cv624-MHT, 2025 WL 1869428, at *7-8 (M.D. Ala. July 7, 2025) (Thompson, J.) (same).

## C. Defendants' Shotgun-Pleading Assertion

The court now turns to defendants' final argument: that the amended complaint should be dismissed as it constitutes an impermissible "shotgun pleading," in violation of Federal Rules of Civil Procedure 8(a)(2) and 10(b). A complaint is a "shotgun pleading" when it presents claims in a manner in which a defendant cannot "discern what [the plaintiff] is claiming and frame a responsive pleading." *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1533 n.14 (11th Cir. 1985). At bottom, the complaint must "give the defendants adequate notice of the claims against them and the

grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

The Eleventh Circuit has recognized several categories of shotgun pleadings. *See id.* at 1321–23. Defendants argue that the amended complaint here falls within the category that addresses complaints that assert "multiple claims against multiple defendants without specifying" which defendant is responsible for which actions or specifying which defendant each claim is directed toward.[10] *Id.* at 1323.

---

10. Defendants Dunn, Daniels, and Brand explicitly label the amended complaint as this type of shotgun pleading. While Gordy does state which category he believes the amended complaint falls into, his brief sounds like it agrees with Dunn, Daniels, and Brand's position. For instance, it states that grouping Warden Gordy and other defendants together and referring to them collectively as 'Supervising Defendants' "places Gordy in the position of guessing who an allegation or claim is directed toward." Gordy Br. (Doc. 95) 6. Regardless, the amended complaint is not any of the other types of shotgun pleadings.

Defendants contend that the amended complaint does not distinguish between the named defendants. Dunn, Daniels, and Brand argue that "plaintiff fails to allege what act or omission of each ADOC Official he believes qualifies as a constitutional violation." Dunn, Daniels, and Brand Br. (Doc. 97) 7. And Gordy contends that the amended complaint refers to them only jointly as "supervising defendants," without specifying which defendant engaged in each action. Gordy Br. (Doc. 95) 6. This argument misunderstands this category, which concerns cases where no specific defendants are named, not where all the defendants are explicitly named, and the allegations apply to all of them. In essence, defendants contend that the amended complaint implicitly asserts all the named defendants shared the same knowledge and took the same actions. However, that contention is a dispute over whether the

allegations are true, not whether they are comprehensible.

"Comprehension, not perfection, is the standard of the pleading rules." *Brown*, 760 F. Supp. 3d at 1344. And, in this case, plaintiff's amended complaint is sufficiently comprehensible so as not to be a shotgun pleading.


IV. CONCLUSION

For the above reasons, defendants' motions to dismiss will be denied as to Count 5 that asserts a failure to protect from a generalized risk, and granted as to the failure-to-intervene claim in Count 2, the failure-to-protect claim premised on a specific risk in Count 4, the state-created danger claim in Count 6, and the wrongful-death claim in Count 7. The court emphasizes that it has relied on only plaintiff administrator's allegations, and it has found only that

plaintiff may proceed with discovery on Count 5.
Whether the evidence supports those allegations is not
before the court at this time. And, as discovery has
not yet begun, whether the evidence supports the
conclusion that Dunn, Daniels, Brand, or Gordy were
deliberately indifferent is also not before the court
at this time.

**\*\*\***

Accordingly, it is ORDERED that:

(1) Defendants Jefferson Dunn, Charles Daniels, and
Matthew Brand's motion to dismiss (Doc. 96) and
defendant Christopher Gordy's motion to dismiss
(Doc. 93) are granted in part and denied in part.

(2) Said motions are denied as to Count 5
(generalized-risk claim) as to these defendants.

(3) Said motions are granted as to Count 2 (failure
to intervene), Count 4 (specific-risk claim), Count 6
(state-created danger), and Count 7 (wrongful death) as

to these defendants. Those counts are dismissed without prejudice against these defendants.

    This case is not closed.

    DONE, this the 30th day of September, 2025.

                              /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE